UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA,

     Plaintiff,

v.                                        CASE No. 8:06-CV-1457-T-TGW

LEONARD WEISMAN, et al.,

     Defendants.

_____

## O R D E R

THIS CAUSE came on to be heard upon the defendant Leonard

Weisman's Motion for Partial Summary Judgment (Doc. 28), the plaintiff's

response and Cross Motion for Summary Judgment (Docs. 31, 33), and

defendants' responses to the plaintiff's Cross Motion for Summary Judgment

(Docs. 38, 40).[1]

In this case, the United States seeks to collect tax debts for the

years 1988, 1989, and 1990 that were incurred by Weisman and his wife,

Elsie Weisman (Doc. 1, ¶1).  The government has sued to set aside four

---

[1]The parties have consented in this case to the exercise of jurisdiction by a United
States Magistrate Judge (Doc. 22).

·

transactions undertaken by Weisman with the defendants, Robin Madden, Gay Courter, Natural Resources Group, S.A., and Railway Marketing Corporation. It contends that these transactions were fraudulently undertaken in violation of Florida's Uniform Fraudulent Transfer Act ("FUFTA"), §726.101, et seq., Fla. Stat., in order to avoid Weisman's tax debts.[2]

The government cannot prevail on a theory of constructive fraud because that theory requires a showing of insolvency at the time the transactions took place and there is not even an issue of fact that Weisman was insolvent at those times. Further, with respect to a theory of actual fraud, the government, as a matter of law, cannot succeed on its attempt to set aside either Weisman's disclaimer of an interest in his deceased wife's estate or a loan he obtained from Railway Marketing Corporation that was used to pay federal income taxes. However, there are factual disputes warranting trial with respect to a loan from Weisman to Madden, and a loan from Natural Resources Group to Weisman. Therefore, the government's motion for summary judgment will be denied, while Weisman's motion will be granted in part and denied in part.

---

[2]Robin Madden and Gay Courter are Weisman's daughters (Doc. 33, p. 8, ¶4). The defendant companies, Natural Resources Group, S.A., and Railway Marketing Corporation, were created and are controlled by Weisman (id., ¶¶ 9, 21).

I.

The Internal Revenue Service ("IRS") audited Weisman and his wife, Elsie Weisman, for the tax years 1988, 1989, and 1990, beginning on July 5, 1990, November 8, 1990, and July 9, 1992, respectively (Doc. 1, ¶12). It was not until June 25, 1997, however, that the IRS issued a notice of tax deficiency to the Weismans (id., ¶14). On September 24, 1997, Weisman filed a challenge to the deficiency in Tax Court (id., ¶15). Early in 1999 the Tax Court entered a stipulated decision assessing additional taxes and interest for the years 1988-90 (id., ¶17). The government filed a tax lien on Weisman's property on July 7, 1999, for unpaid taxes for those years (Doc. 30, ¶5). As of May 29, 2008, Weisman's tax obligation for 1988-90 totaled approximately $1,100,000.00 (Doc. 33, p. 2).

During the period from 1995-99, Weisman engaged in four transactions that the government contends were fraudulent transfers. The first transaction concerns a loan that Weisman made to his daughter, Robin Madden.

On April 15, 1995, Weisman signed an agreement to borrow up to $3,000,000.00 from defendant Natural Resources Group ("NRG"), a company he controlled, and in return he pledged stock in NRG of equal value

-3-

as collateral (Doc. 30, ¶4a; Doc. 39, ¶¶ 3a, 4). On May 8, 1995, Weisman drew $1,000,000.00 on the NRG agreement and transferred the money to another company he controlled, defendant Railway Marketing Corporation ("RMC"), as partial payment for an outstanding debt (Doc. 39, ¶3b). Through a second draw of $599,982.00 on his NRG loan, he then loaned Madden $538,500.00 on October 16, 1995, to purchase a residence (Doc. 30, ¶4b; Doc. 39, ¶3b). Madden's terms under her loan agreement required only interest payments until October 2025 when the principle becomes due, but which would be forgiven if Weisman, who, at that time, would be 110 years old, is no longer alive (Doc. 33, p. 16, ¶35; Doc. 39, ¶2).

The second transaction involved Mr. and Mrs. Weisman's multi-million dollar twenty-acre waterfront residence located at One Weisman Court, Crystal River, Florida ("One Weisman Court").[3] The Weismans held the property in tenancy by the entirety, but, on May 1, 1996, they transferred their interests to a tenancy in common (Doc. 33, p.8, ¶3). Mrs. Weisman died testate on October 4, 1996 (id., p. 10, ¶12). About a month thereafter, Weisman executed a disclaimer of his interest in Mrs. Weisman's estate,

---

[3]The land and construction of the residence in 1980 cost approximately $1,100,000.00 (Doc. 33, ¶2). One Weisman Court is currently for sale for between four and five million dollars (Doc. 39, ¶17).

including the one-half interest in One Weisman Court (Doc. 30, ¶4c; Doc. 33, ¶13).  On June 25, 1997, Weisman, as personal representative of his wife's estate, transferred his deceased wife's one-half interest in One Weisman Court to their daughters, Courter and Madden (Doc. 33, p. 10, ¶16).  Also, the IRS on this same day issued notice to Weisman of his tax deficiency (Doc. 1, ¶14; Doc. 33, p. 11, ¶17).

The third challenged transfer concerns a loan Weisman received from RMC.  On December 23, 1998, Weisman borrowed $245,000.00 from RMC and gave a mortgage on One Weisman Court in return (Doc. 33, pp. 16-17, ¶36).  That same day, Weisman wrote a check for $243,245.68 payable to the IRS, apparently for 1996 taxes (Doc. 30, pp. 21-22, Ex. H).

The fourth transaction concerns the 1995 loan agreement with NRG.  In 1999, Weisman's 50% interest in NRG, previously valued at $3,000,000.00, allegedly lost value to $913,263.00, rendering it insufficient as collateral to secure Weisman's $1,936,433.00 loan from NRG (reflecting the draws of $1,000,000.00 for the payment to RMC for past debt and $599,982.00 for the daughter's home purchase, plus interest) (Doc. 39, ¶¶ 4, 5, 11).  Weisman, on June 18, 1999, executed a note and mortgage in favor

-5-

of NRG on One Weisman Court to secure the debt, and surrendered his shares and interest in the company (id., ¶¶ 5, 6).

In this suit, the United States asks that judgment be entered in its favor in accordance with the Tax Court decision (Doc. 1, p. 11). Second, it requests that any title or lien interest held by the other defendants be declared void and the title be re-vested, if necessary, in Weisman (id.). The government also seeks foreclosure of its tax lien on One Weisman Court and the proceeds distributed to the United States until the tax liabilities are paid in full (id.). Finally, the United States prays for a judgment against Madden for $538,000.00 plus interest (id.).

Weisman has moved for partial summary judgment, contending that the government cannot establish the essential elements of constructive fraud or actual fraud under FUFTA as a matter of law for the challenged four transactions (Doc. 28, p. 2). The government argues in its cross motion for summary judgment that no genuine issues of material fact remain on the four transactions and that it is entitled to summary judgment as a matter of law (Doc. 33). Oral argument was heard on the motions.

II.

The court shall enter summary judgment only if the evidence shows "that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." F.R.Civ.P. 56(c). Material facts are those over which disputes "might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Disputes about material facts are genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. The movant bears the burden of establishing the absence of a dispute over material facts. Reynolds v. Bridgestone/Firestone, Inc., 989 F.2d 465, 469 (11th Cir. 1993).

When the party opposing the summary judgment motion has the burden of proof at trial, the moving party may discharge its initial burden by identifying specific portions of the record which show the absence of evidence to prove the nonmoving party's case at trial, or, alternatively, it may come forward with "affirmative evidence demonstrating that the nonmoving party will be unable to prove its case at trial." United States v. Four Parcels of Real Property, 941 F.2d 1428, 1437-38 (11th Cir. 1991). If the moving

-7-

party does not meet its burden, then the motion for summary judgment will be denied. Id.

Where the moving party meets its initial burden, the burden then shifts "to the non-moving party to demonstrate that there is indeed a material issue of fact that precludes summary judgment." Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991). If the party opposing the motion is unable to make a sufficient showing on an element essential to its case on which it has the burden of proof at trial, the movant is entitled to summary judgment. United States v. Four Parcels of Real Property, supra, 941 F.2d at 1438.

Where the party moving for summary judgment has the burden of proof at trial, it must affirmatively show the absence of a genuine issue of material fact by presenting credible evidence that would entitle it to a directed verdict if the evidence was not controverted at trial. Id. If the moving party does not meet its burden, then the motion for summary judgment will be denied. Id. at 1437-38. If the movant meets its initial burden, then it is entitled to summary judgment unless the nonmoving party comes forward

with "significant, probative evidence demonstrating the existence of a triable issue of fact." Id. at 1438.

In determining whether the moving party should be awarded summary judgment, the court must view the evidence and factual inferences therefrom in the light most favorable to the opposing party. Reynolds v. Bridgestone/Firestone, Inc., supra, 989 F.2d at 469. Any reasonable doubts about the facts are to be resolved in favor of the party opposing the motion for summary judgment. Id.

### III.

A. The government's complaint asks, specifically, that judgment be entered in favor of the United States against defendant Weisman for the tax liabilities for 1988-90 (Doc. 1, p. 11). No opposition was presented by Weisman to this claim. Consequently, at the conclusion of the case, judgment will be entered in favor of the government in the amount that the United States demonstrates is correct.

B. As indicated, the government challenges four transactions as fraudulent transfers. Such a challenge can be based upon a theory either of

actual fraud or constructive fraud.  See §§ 726.105(1)(a) and (b), 726.106, Fla. Stat.; see also Munim v. Azar, 648 So.2d 145, 152-53 (Fla. App. 1994). The defendant Weisman's motion for summary judgment attacks primarily any claims of constructive fraud, while the government at the hearing indicated that it was relying essentially upon the theory of actual fraud. Not surprisingly, in light of these approaches, Weisman has established that he is entitled to summary judgment with respect to the constructive fraud theory.

The parties appear to agree that, in order to prevail on a constructive fraud theory, a creditor must show the transfer was made without the receipt of a reasonably equivalent value, and the debtor was insolvent at the time of the transfer or became insolvent as a result of the transfer (see Doc. 28, p. 6; Doc. 33, p. 19; Doc. 40, p. 3).  At the hearing, the government stated that the court did not need to consider the issue of reasonably equivalent value, thereby essentially eschewing the constructive fraud theory. In all events, the government has failed to show that there is at least a factual dispute regarding Weisman's solvency at the time of the transfers.

-10-

Weisman has submitted an affidavit stating that he was in a position from 1995-99 to pay all his obligations as they became due (Doc. 30, ¶3). Moreover, he has supported that statement with specifics. Thus, Weisman's IRS 1040 Forms for 1998, 1999, and 2001 show incomes of $114,704.00, $218,334.00, and $349,542.00, respectively (Doc. 39, ¶¶ 12-14).

Further, Weisman avers that his interest in NRG was valued up through the end of 1998 at no less than $913,263.00 (Doc. 39, ¶11). His home, in 2000, was worth one to two million dollars (id.). In addition, he paid on December 23, 1998, to the IRS more than $243,000.00 (id., ¶8). Weisman also possessed a condominium at the time of the transfers which he sold in 2004 for $89,000.00, paying the proceeds to the IRS (id., ¶15).

Weisman, moreover, indicated that he made regular payments on his obligations for some time after the last disputed transfer (Doc. 39, ¶¶ 3, 16). Thus, Weisman made six quarterly payments of $34,570.00 on his NRC note, including two in 1999 and four through the end of 2000 (Doc. 30, ¶6;

-11-

Doc. 39, ¶7). Weisman also established that he regularly paid on the RMC note through the year 2004 (Doc. 39, ¶9).

In the face of Weisman's showing, the government provides no evidence that Weisman was unable to pay his debts as they became due during the period covering the four transactions. Lacking evidence, the government argues briefly, and unpersuasively, that Weisman should be presumed insolvent because he made "[n]o meaningful payments" on his tax debt as it came due (Doc. 33, p. 21). See §726.103(2), Fla. Stat. ("a debtor who is generally not paying his or her debts as they become due is presumed to be insolvent"). However, the tax obligations were being contested until the Tax Court's decision in March 1999. Furthermore, Weisman has demonstrated sufficient assets to pay those obligations at that time (see Doc. 1, p. 5). The government has clearly failed to show otherwise.

To the extent that the government is asserting a claim of constructive fraud – and the government's interest in pursuing such a theory seems half-hearted at best – the claim fails because the government has not come forward with any probative evidence indicating that Weisman was

-12-

insolvent at the time of any of the transfers. It is appropriate to add that, at the hearing, the government attorney said that it was unnecessary to address the issue of reasonably equivalent value. Of course, the lack of reasonably equivalent value is required in order to prevail on a claim of constructive fraud.

C. The government's claim of fraudulent transfer is based primarily upon the theory of actual fraud. A transfer is fraudulent if made "with actual intent to hinder, delay, or defraud any creditor of the debtor." §726.105(1)(a), Fla. Stat.

The statute lists eleven factors, or "badges of fraud," to consider, among other things, in determining if actual fraudulent intent existed. Id. Those factors are:

> (a) The transfer or obligation was to an insider.
>
> (b) The debtor retained possession or control of the property transferred after the transfer.
>
> (c) The transfer or obligation was disclosed or concealed.

-13-

(d) Before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit.

(e) The transfer was of substantially all the debtor's assets.

(f) The debtor absconded.

(g) The debtor removed or concealed assets.

(h) The value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred.

(i) The debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred.

(j) The transfer occurred shortly before or shortly after a substantial debt was incurred.

(k) The debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

In general, a single badge of fraud may not constitute the requisite fraud to set aside a conveyance, while several of them considered together may support such an inference. General Trading Inc. v. Yale

-14-

Materials Handling Corp., 119 F.3d 1485, 1498 (11th Cir. 1997), cert denied,
523 U.S. 1055. Moreover, other factors that are not listed may appropriately
be considered. Id. Further, courts are to take into account the facts
surrounding a transaction so that the issue of actual intent is considered in
context and not in a vacuum. Id. at 1498-99.

Under these principles, two of the four challenged transactions
cannot support a finding of actual fraudulent intent as a matter of law.
Considering first the loan from RMC to Weisman of $245,000.00, Weisman
has demonstrated that he paid those funds to the IRS. Thus, the funds from
the loan were deposited into Weisman's personal account (Doc. 39, ¶8).
After taxes were subtracted, Weisman wrote a check for $243,245.68 to the
IRS to pay his tax obligation, apparently for 1996 taxes (Doc. 30, pp. 21-22,
Ex. H).

The government argued (disconcertingly) at the hearing that it
could not find a record of this payment. The copy of the check produced by
Weisman shows that it was deposited by the District Director in Jacksonville
to the credit of the U.S. Treasury on December 31, 1998 (id.).    The

-15-

government has not made any challenge to the authenticity of the copy that Weisman has submitted.

Moreover, the government has not asserted any contention suggesting that the IRS was somehow defrauded because the loan proceeds went to pay a 1996 tax obligation, rather than the ones from 1988-90. Consequently, there is no plausible basis for concluding that Weisman acted with intent to defraud the IRS when he borrowed $245,000 from RMC and paid that money to the IRS.

Similarly without merit is the challenge to the transfer of Mrs. Weisman's one-half interest in One Weisman Court to the daughters (Doc. 33, p. 22). Mrs. Weisman died on October 4, 1996, leaving to her husband in her will her half interest in the residence (id., p. 10, ¶13). Weisman disclaimed his right to the estate on November 8, 1996 (Doc. 30, ¶4c; Doc. 33, p. 10, ¶13). Weisman, as personal representative of his wife's estate, transferred the interest in one Weisman Court to Madden and Courter on June 25, 1997 (Doc. 33, p. 10, ¶16).

-16-

Florida law treats Weisman's disclaimer as if he predeceased his wife. §739.104, Fla. Stat.   Accordingly, Weisman argues, logically, that his disclaimer did not constitute a transfer, so that there could not have been a fraudulent transfer.

The parties agree that, once a tax lien attaches, inheritance becomes property that cannot be disclaimed under state law. Drye v. United States, 528 U.S. 49 (1999). In this case, however, a tax lien was not filed until more than two years after the disclaimer. Weisman cites authority holding that, in these circumstances, Drye is inapposite (Doc. 38, p. 6). The United States was unable to provide any authority to the contrary.

At the hearing, the government also asserted that Weisman's power as personal representative to execute the deed to his daughters is a transfer of property for the purposes of a claim of actual fraud. However, as Weisman correctly pointed out, there is no allegation in the complaint challenging as a fraudulent transfer Weisman's execution in his role as personal representative of a deed to an interest in the property. Consequently,

-17-

this belated and unalleged assertion cannot provide a basis for a claim of a fraudulent transfer.

Moreover, Weisman's role was ministerial and administrative. He was not transferring his own property. The United States has provided no authority supporting a conclusion that, in this circumstance, Weisman could have been engaged in a fraudulent transfer under the FUFTA.

Accordingly, the government's challenge to the disclaimer fails. This does not mean, however, that evidence of the transaction will be excluded at trial as part of the context of the government's claim of fraudulent intent with respect to other transactions. This act, coupled with the wife's earlier modification of her interest from tenant by the entirety to tenant in common and Weisman's failure to pay any compensation for his use of his daughters' half interest, could shed light upon whether Weisman acted with actual intent to hinder, delay, or defraud the IRS.

A third challenged transaction is the loan on October 10, 1995, by Weisman of $538,500.00 to Madden to purchase a home. Neither side is entitled to summary judgment on this transaction with respect to a claim of

-18-

actual fraud. In fact, Weisman did not press for such relief, acknowledging that, in general, questions of intent are to be determined by the factfinder after trial (Doc. 28, p. 16). This transaction does not involve the rare case that is an exception to that rule.

The note to Madden provided only for yearly interest payments in the amount of $35,325.60 unless Weisman lived until October 19, 2025, when at age 110, his daughter would owe the unpaid principal (Doc. 33, p. 16, ¶35). This loan obviously was to an insider. Moreover, a factfinder could conclude that Weisman did not receive reasonably equivalent value. Thus, the factfinder could discount Weisman's assertion that he has been paid about 85% of the principal amount. That, however, has mostly been interest (id., Ex. B, pp. 19-20). Paying for the use of $538,500.00 is plainly not the same as paying the money back.

Furthermore, the record is vague regarding Madden's need for assistance in buying her house. Madden, at the time, was a pediatrician and her husband seemingly was a medical doctor also (id., pp. 5, 8). These

-19-

circumstances call into question Weisman's stated reason for loaning money to his daughter.

The final transaction concerns the mortgage lien from Weisman to NRG in the amount of $1,936,433.00. Summary judgment is also not warranted on this claim of actual fraudulent intent.

On April 15, 1995, Weisman signed a loan agreement for up to $3,000,000.00 with NRG, pledging his stock in NRG as collateral (Doc. 40, p. 16). The stock allegedly constituted sufficient collateral at that time and he drew upon the loan twice (Doc. 30, ¶4a). The first draw occurred on May 8, 1995, for $1,000,000.00 that he transferred to RMC to pay an antecedent debt (Doc. 39, ¶3b). Second, Weisman drew $599,982.00, which he provided in the amount of $538,500.00 to permit his daughter to purchase a home on October 19,1995 (Doc. 30, ¶4b; Doc. 39, ¶3b). The total including interest on the note was $1,936,433.00 (Doc. 40, p. 16).

The defendants assert that, when the value of the NRG stock securing the loan decreased in 1999 below the amount of the two draws on the loan, Weisman returned his fifty percent stock ownership to the

corporation as partial repayment of his debt (id.). He secured the debt by executing, on June 18, 1999, a mortgage lien on his half of One Weisman Court in favor of NRG for the remaining outstanding balance of the loan (id.). The mortgage lien therefore substituted the initially pledged collateral of NRG stock with replacement collateral.

Weisman, however, has provided no cogent reason why he needed to provide substitute collateral. After all, he controlled NRG. Moreover, the United States points out that this transaction occurred on the same day that his power of attorney was advised that the collection due process appeal had been denied and the collection action proposed by the IRS sustained (Doc. 33, p. 16, ¶34).

Frankly, this transaction looks particularly suspicious. But that suspicion is not enough to justify summary judgment for the United States.

It is, therefore, upon consideration

ORDERED:

That the defendant's Motion for Partial Summary Judgment (Doc. 28) is hereby **GRANTED** to the extent that all claims of constructive

-21-

fraud and the claims of actual fraud concerning the disclaimer and the loan of $245,000.00 from Railway Marketing Corporation are **DISMISSED**. In all other respects, the motion is **DENIED**. Further, the plaintiff's Cross Motion for Summary Judgment (Doc. 33) be, and the same is hereby, **DENIED**.

DONE and ORDERED at Tampa, Florida, this 3rd day of November, 2008.

THOMAS G. WILSON
UNITED STATES MAGISTRATE JUDGE